UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SEMAJ D. MORAN,

       Petitioner,

                                                                  Case No. 16-cv-11993

v.

                                                                  HON. MARK A. GOLDSMITH

SHARMAN CAMPBELL,

       Respondent.

_____/

## OPINION AND ORDER
## DENYING PETITION FOR WRIT OF HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY, AND GRANTING PERMISSION TO APPEAL IN FORMA PAUPERIS

Petitioner Semaj D. Moran filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. 1), challenging his Oakland County Circuit Court convictions for two counts of first-degree murder, Mich. Comp. Laws § 750.316, and commission of a felony with a firearm, Mich. Comp. Laws § 750.227b. Petitioner was sentenced to life imprisonment for the murder convictions and consecutive two-year terms for the firearm convictions.

The petition raises a single claim: Petitioner's Fifth Amendment right against self-incrimination was violated by admission of his involuntary statement to the police at trial. For the reasons stated below, the Court denies the petition, denies a certificate of appealability, and grants permission to proceed on appeal in forma pauperis.

### I. BACKGROUND

Petitioner's convictions arise out of the shooting death of two women in their Pontiac home. This Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). See

1

Wagner v. Smith, 581 F.3d 410, 413 (6th Cir. 2009).

This case arises from an incident involving a home invasion and shooting that took place on February 17, 2012, in Pontiac, Michigan. Andrew Threlkeld testified that, on February 17, 2012, between approximately 8:00 p.m. and 8:30 p.m., he drove to a residence in Pontiac to visit his two longtime friends, Loretta Fournier and Luann Robinson. The two women lived in separate apartments on the two floors of the residence, although the apartments shared a common entrance and front hall area. When he arrived at the house, he noticed that the front door was cracked open. He pushed the door open and immediately saw Robinson's body lying at the bottom of the stairs in the front hall, just inside the front door. Approximately 10 feet away, Threlkeld observed Fournier's body lying in the front hall area. He smelled what he believed to be gunsmoke in the air; fearing that an armed intruder was inside the house, he ran outside and drove to a nearby business, where he called 911.

Police officers who arrived at the scene testified that they found Fournier and Robinson dead; Fournier had suffered two gunshot wounds to her face and one to her back, while Robinson had suffered one gunshot wound to her head. The officers also discovered a strike plate from the front door just inside the front hall and a baseball hat on the stairs leading up to Robinson's apartment. In Robinson's apartment, a television was on the floor just in front of the stairs down to the front hall, with the power cord leading back into Robinson's bedroom, and a cable box was unscrewed from the wall in the bedroom. After speaking with neighbors, police officers identified a person with the nickname "Hype" as a potential suspect for the shootings because he supplied marijuana to one or both of the victims. Police officers used Fournier's cell phone to identify a phone number for "Hype," who was then identified as defendant Howard. Officers traveled to Howard's home that night to speak with him. When officers arrived at Howard's home, Howard's mother allowed the officers inside and informed them that Howard was in his bedroom. After speaking with the officers inside the home, Howard was arrested.

Following his arrest, Howard was interviewed three separate times by police officers at a police station.

Jeff Buchmann of the Oakland County Sheriff's Department testified that the first interview was conducted on February 18, 2013 and that, at the outset, he informed Howard of his Miranda rights and obtained a waiver of those rights. According to Buchmann,

during this interview, Howard claimed that he and Moran had gone to the residence of Fournier and Robinson for the purpose of smoking marijuana. Howard told Buchmann that while he was in the bathroom, he heard gunshots and when he exited the bathroom, he saw Fournier's body lying on the ground. He then stated that approximately 20 seconds later, he heard Robinson scream upstairs, heard more gunshots, and then heard Robinson's body tumble down the stairs.

The second interview, held the following day, February 19, 2013, was conducted after police recovered a purse containing identification belonging to one of the victims in the backyard of a residence near the scene of the crimes. Buchmann again conducted the interview and it is undisputed that he did not again read Howard his Miranda rights. During this brief interview, a transcript of which has been provided to this Court, Howard admitted to taking the purse and attempting to take the television that was found on the floor. However, he reiterated that he never had a gun on the night of the murders and that Moran had shot the two women.

Howard's third and final interview was conducted the following day, February 20, 2013. Before this interview, Buchmann read Howard his Miranda rights. According to Buchmann, Howard admitted to forcing open the door to the apartment and acknowledged that the baseball hat found on the stairs belonged to him. During the interview, Howard provided a written statement that read:

> I was going to – was going to go smoke with [Fournier] as I do usually and my friend Semaj came along to ask [Fournier] about the fake money she gave Semaj when he sold her some weed. I told him he can ask her about the situation if he wanted to, but I never asked him to come or nothing else. He came and smoked, talked for a minute.
>
> I went to the bathroom. He shot [Fournier], but I never planned or made any part in the actions that took place. The most I did wrong was not calling the police and report what I saw, but other than that I didn't plan, plot or have any control over the actions that my friend made. I went to smoke with [Fournier], that's it.

3

> The lady upstairs was screaming. I pushed her down the stairs and Semaj said he couldn't leave any witnesses and he shot her.

> Several days later, police returned to Howard's home with a search warrant and searched his room. Inside the pocket of Howard's coat, found in his bedroom closet, officers discovered multiple forms of identification belonging to the victims, including credit cards and insurance policies.

> On February 19, 2013, Moran was interviewed by police at a substation of the Oakland County Sheriff's Department. Moran's mother traveled to the police station with him and gave officers permission to speak with him. Prior to interviewing Moran, Buchmann read him his Miranda rights. During the interview, Moran gave a written statement to Buchmann that read:

>> Around 8:00 – I walked to [Fournier's] house on Pingree. We sat at the table and we smoked. Hype gave me the gun while [Fournier] was in her room getting the hookah – the hookah – the hookah bong. And told me when you hear the toilet flush shoot. I heard the toilet flush, but I hesitated to shoot. I shot two shots and Hype ran up the stairs. While he was upstairs I heard a lady screaming. Then I heard multiple booms. When I looked the lady was on the floor. He told me to shoot her. After I shot her I started crying and running. While we were running I threw the gun behind a church/store. Hype told me to swear on my grave I wouldn't tell. I got home and told my grandma. My mom came to get me. We stayed at the hotel. Then I left to Detroit with my aunt and mom. We returned to go talk to the police.

People v. Moran, No. 318102, 2014 WL 7338888, at *1-3 (Mich. Ct. App. Dec. 23, 2014).

Following his conviction and sentence as indicated above, Petitioner filed an appeal of right. His appellate counsel filed a brief on appeal raising a single claim: "Admission of involuntary inculpatory statements constituted reversible error." Appellant Br. at 35 (cm/ecf page) (Dkt. 7-21).

The Michigan Court of Appeals rejected the claim on the merits. After indicating that

4

the voluntariness of Petitioner's statements required an examination of the totality of the circumstances, the court found that Petitioner's statement was voluntary:

> In this case, the officers complied with Miranda prior to interviewing Moran. It is uncontested that before officers questioned Moran, they informed him of his Miranda rights and he signed a form indicating that he wanted to waive those rights. Moran contends that "the investigative detectives did not make certain that the fifteen year old understood that he did not have to speak with them." However, we have listened to the taped interview in its entirety and Moran's contention that the officers failed to comply with Miranda is unsupported by the record. Moreover, they spoke with him outside his mother's presence only after receiving her permission to do so.
>
> Moran's contention that he was subjected to repeated and prolonged questioning is similarly inconsistent with the record. At the time of questioning, Moran was 15 years old, attended school, and indicated that he was not intoxicated or under the influence of any substance. He appeared to understand all of Buchmann's questions. He was not deprived of food, sleep, or medical attention, and there was no contention that he was threatened or abused in any way. In spite of the absence of Moran's mother during question, under the totality of the circumstances, we conclude that Moran's statements to the officers were made freely and voluntarily. Accordingly, the trial court's denial of Moran's motion to suppress his statements was supported by the record and not erroneous.

Moran, 2014 WL 7338888, at *5–6.

Petitioner subsequently filed an application for leave to appeal in the Michigan Supreme Court, which raised the same claim. The Michigan Supreme Court denied the application because it was not persuaded that the questions presented should be reviewed by the Court. People v. Moran, 864 N.W.2d 571 (Mich. 2015) (table).

## II. STANDARD OF REVIEW

Title 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 405-406 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." Id. at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411.

The Supreme Court has explained that a "federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Thus, the AEDPA "imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010). A "state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 131 S. Ct. 770, 786 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's

contrary conclusion was unreasonable." Id. Furthermore, pursuant to section 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. Id. Habeas relief is not appropriate unless each ground that supported the state-court's decision is examined and found to be unreasonable under the AEDPA. See Wetzel v. Lambert, 132 S. Ct. 1195, 1199 (2012).

"If this standard is difficult to meet, that is because it was meant to be." Harrington, 131 S. Ct. at 786. Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from re-litigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. Id. Indeed, section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Id. A "readiness to attribute error [to a state court] is inconsistent with the presumption that state courts know and follow the law." Woodford v. Viscotti, 537 U.S. 19, 24 (2002). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state-court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 131 S. Ct. at 786-787.

A state court's factual determinations are presumed correct on federal habeas review. See 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption of correctness only with clear and convincing evidence. Id.; Warren v. Smith, 161 F.3d 358, 360-361 (6th Cir. 1998).

7

Moreover, habeas review is "limited to the record that was before the state court." Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

### III. ANALYSIS

**A. Merits**

Petitioner claims that the trial court erred in denying his motion to suppress his confession on the grounds that it was involuntarily given in violation of his Fifth Amendment right against self-incrimination due to coercive police activity. Petitioner, who was fifteen years old at the time of the crime, asserts that he went to the police station with his mother when his uncle learned that he was wanted for questioning. Petitioner claims that his mother was not informed that Petitioner was the suspect in a double murder when she gave police permission to speak with her son. Petitioner claims that he was then tricked into giving a statement when a detective told him that his mother wanted him to speak with them. Petitioner waived his Miranda rights and eventually made inculpatory statements.

Under federal law, a confession is considered involuntary if (i) the police extorted the confession by means of coercive activity; (ii) the coercion in question was sufficient to overbear the will of the accused; and (iii) the will of the accused was in fact "overborne because of the coercive police activity in question." McCall v. Dutton, 863 F.2d 454, 459 (6th Cir. 1988) (emphasis in original). The ultimate question is "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." Miller v. Fenton, 474 U.S. 104, 112 (1985). Factors to consider include the presence or absence of police coercion (a "crucial element"), length of interrogation, location of interrogation, continuity of interrogation, the suspect's maturity and education, the suspect's physical condition and mental health, and whether the suspect was advised of his Miranda rights.

8

Withrow v. Williams, 507 U.S. 680, 693-94 (1993). Without coercive police activity, however, a confession should not be deemed involuntary. Colorado v. Connelly, 479 U.S. 157, 167 (1986) (stating that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause"). The burden of proving that a confession was given involuntarily rests with the petitioner. Boles v. Foltz, 816 F.2d 1132, 1136 (6th Cir. 1987). Voluntariness need only be established by a preponderance of the evidence. Id.

Subsidiary factual questions in determining the voluntariness of a statement to police, such as whether the police engaged in intimidation tactics alleged by a habeas petitioner, are entitled to the presumption of correctness accorded to state-court findings of fact. Miller, 474 U.S. at 112; § 2254(e)(1). Likewise, whether a defendant understood his Miranda rights is a question of fact underlying the question of whether his waiver of those rights was knowing and intelligent. On federal habeas review, a federal court must presume that the state court's factual finding that a defendant fully understood what was being said and asked of him was correct, unless the petitioner shows otherwise by clear and convincing evidence. Williams v. Jones, 117 F. App'x 406, 412 (6th Cir. 2004).

In juvenile cases, the totality of the circumstances approach requires an "evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." Fare v. Michael C., 442 U.S. 707, 725 (1979) (citing North Carolina v. Butler, 441 U.S. 369 (1979)). The Supreme Court has spoken of the need to exercise "special caution" when assessing the voluntariness of a juvenile confession, particularly when there is prolonged or repeated questioning, or when the interrogation occurs in the absence of a parent, lawyer, or other friendly adult. In re Gault, 387 U.S. 1, 45 (1967); Gallegos v.

Colorado, 370 U.S. 49, 55 (1962); Haley v. Ohio, 332 U.S. 596, 599-601 (1948).

The trial court held an evidentiary hearing to determine the voluntariness of Petitioner's confession. Detective Jeff Buchmann testified that Petitioner's mother, Estrella Moran, brought Petitioner to the police station on February 19, 2012, after police officers contacted members of the Moran family. 8/9/2012 Hr'g Tr. at 12-13 (Dkt. 7-5). Buchmann asked Estrella if he could speak with Petitioner about the homicide on Pingree Street, and she gave her permission. Id. at 13-14. Buchmann also asked Estrella if he could speak with Petitioner alone, and Estrella agreed. Id. Buchmann knew that Petitioner was fifteen and one-half years old at the time. Id. at 16. An audiotape of the interview was made and played for the court. Id. at 17-18.

Buchmann explained to Petitioner that he was at the police station and that his mother gave him permission to speak with Petitioner. Buchmann told Petitioner, "We've talked to your mom, and she gave us permission to talk to you." Id. at 45. Buchmann told Petitioner, "So do you want to talk to us? Your mom said it's okay to talk to us," before Petitioner was advised of his Miranda rights. Id. at 21-22, 54-55. Petitioner told the officer that he could read and write. Petitioner appeared coherent and not under the influence of controlled substances. Id. at 23-24. Petitioner stated that he was rested and had already ate. Buchmann asked Petitioner if he wanted to talk to him, and Petitioner replied, "Yes." Id. at 24. Petitioner's interview lasted approximately forty-five minutes. Id. at 29.

Petitioner made incriminating statements sixteen minutes into the interview. Id. at 30-31. Petitioner also made a written statement. Id. at 33. Buchmann stated that there was no coercion, trickery, or deceit in obtaining Petitioner's statement. Id. at 35. A photocopy of Petitioner's written statement and a map was admitted at the hearing. Id. at 69-70. A transcript and an audio recording of Petitioner's interview were also admitted. Id. at 73-75. The audio recording was

10

played in court. Id. at 75.

Gary Miller testified that he was a lieutenant with the Oakland County Sheriff's Department. Id. at 80. Miller spoke with a relative of Petitioner and told him that Petitioner's mother should bring him to the police station. Id. at 83-84. Miller was at the substation when Petitioner and his mother arrived. Id. at 84. Miller escorted Estrella and Petitioner to the second floor. They were seated in the large interview room and turned over to Buchmann. Id. at 85. Miller went into the observation room and heard Estrella say that it was fine that Buchmann talk to her son. Id. at 86. Estrella was arrested after she spoke with Buchmann for violation of a probation warrant. Id. at 87.

Estrella testified that she went to the police station after she was informed that the police wanted to talk to her son. Buchmann took Estrella to a separate room from Petitioner. Id. at 102-103, 106. Buchmann and another detective asked her if it was okay if they speak with her son. Estrella testified that she did not have any idea of Petitioner's rights. Id. at 107. Estrella denied that the detectives told her that they were going to ask Defendant some questions about a murder case or that he was a suspect. Id. at 107-108. The detectives took Estrella back into the room, and she was arrested shortly afterwards. Id. at 109. Estrella admitted that she knew her son was linked to a homicide. Id. at 114. She knew that he was going to talk to the officers about a shooting. Id. at 115.

Petitioner testified that he was fifteen years old on the date he gave his statement. 8/23/2012 Hr'g Tr. at 5 (Dkt. 7-6). Petitioner's aunt dropped him and his mother off at the Oakland County Sheriff's Department. Petitioner testified that he did "[n]ot really" want to speak to them. Id. at 5. Petitioner and his mother were taken to a room with a table and a couple of chairs around it. Id. at 6. Petitioner's mother was taken out of the room, and Petitioner waited

about two minutes for the detectives to bring his mother back. Petitioner was then taken to a different room. Id. at 7-8. According to Petitioner, the detectives told him that his "mother said it was all right to talk to them, and they said, would I like to speak to them, and I said, 'yeah.'" Id. at 9.

Petitioner did not recall having any conversation with the detectives about the advice of rights form before signing it. Id. at 10. Petitioner testified that he did not even really try to read the form because he thought his mother said it was all right. Id. at 11. Petitioner stated that, at some point during the interview, he asked for his mother, but he could not recall exactly when. The detectives later told Defendant that they had to send his mother home. Id. at 12. Petitioner did not really want to make a written statement, but he thought he was required to do so. Id. at 13.

On cross-examination, Petitioner testified that the detectives told him that the advice of rights form were his rights and asked him to sign it. Petitioner chose to sign the form, but he maintained that he did not to read it. Id. at 15. Petitioner claimed that he asked to speak to his mother three different times, and he believed it would be in the recording. Id. at 16-17. Petitioner's mother told him that he had to go to the police station. Id. at 19.

Petitioner knew that the police were going to speak with him about the shooting. Id. at 20. Petitioner testified that he stated in his interview that his grandmother, aunt, and uncle kept telling him to go to the police station and talk. Id. at 23. Petitioner testified that he considered himself a smart kid, and he did not have any learning disabilities or mental health issues. Id. at 26. Petitioner testified that he lied to the detective because he did not want to be known as a snitch or tattletale. Id. at 31, 36. Petitioner first stated that he did not know anything about the shooting, and then he told the officers that "Hype" shot the two ladies. Petitioner testified that his entire written statement was a lie. Id. at 33. Petitioner testified that he did not know where he was

12

when Hype shot the women.  Id. at 34.  Petitioner had heard of Miranda rights on television, but he testified he was lying when he told the detective that he understood his rights.  Id. at 43-44.  Petitioner was advised that anything he said could be used against him, and he admitted that he knew what that meant.  Id. at 45.

Following the hearing, the trial court denied the motion to suppress Petitioner's statements. The trial court issued a written order stating that "the testimony and evidence establish by a preponderance of the evidence that the statements made by Defendant were voluntary and a product of his own choice and free will.  In addition, the Court finds that Defendant knowingly and intelligently waived his Miranda rights."  Op. & Order (Oakland Cnty. Cir. Ct. Oct., 17, 2012) at 79 (cm/ecf page) (Dkt. 7-21).

In light of this record, the Michigan Court of Appeals could determine that Petitioner's statement to police was voluntary without unreasonably applying clearly established Supreme Court law.  Petitioner's chief argument is that his youth, coupled with the officer's statement that his mother gave police permission to speak with him, rendered his statement involuntary.  But Supreme Court cases that have found a juvenile's confession involuntary often included some form of mental coercion, denial of rights, intimidation, threats, or physical abuse in obtaining the confession.  For example, in Haley, a fifteen-year old's confession was found involuntary after the boy was taken from his home in the middle of the night and subjected to relentless questioning. 332 U.S. at 597-601.  The boy was kept in custody for over three days and was not taken before a magistrate or allowed to see a parent or attorney.  Id.  He was not informed of his right to counsel.  Id.  Once before the magistrate, the boy appeared "bruised and skinned."  Id.

Similar to Haley, the Fifth Circuit found an eleven-year old's confession involuntary after the child had been held in custody, unaccompanied by a parent or lawyer, for over three days.

13

Murray v. Earle, 405 F.3d 278, 288 (5th Cir. 2005). The girl was found to be of "below-normal intelligence," had no experience with the criminal justice system, was only briefly informed of her rights prior to the interrogation, and the police told her that everyone "knew" what happened and she could only help her family by telling the truth. Id. at 288-289.

The coercion present in Haley and Murray starkly contrasts with a Supreme Court case in which a juvenile's confessions was found voluntary. In Fare, a sixteen-and-a-half year old's confession was found to be voluntary where there was no evidence that the juvenile was "worn down" by improper interrogation tactics, lengthy questioning, trickery, or deceit. 442 U.S. at 726. The boy "had considerable experience with police." Id. He was told he was being questioned in connection with a murder, his rights were explained fully, and no facts indicated he was unable to understand his rights. Id.

The Court finds that a reasonable jurist might find Petitioner's case more akin to the voluntary confession Fare, than those in Murray and Haley. Like the juvenile in Fare, Petitioner was apprised of his rights and reasonable inferences can be drawn from the record that he understood those rights and waived them by signing a waiver of rights form. Petitioner indicated he was familiar with his rights from television programs. Petitioner was accompanied to the police station by his mother, and the interrogation started minutes after he arrived. Though Petitioner was informed that his mother consented to his questioning, Petitioner was not subjected to the sort of physical abuse, mental coercion, trickery, or deceit like the juveniles in Murray and Haley.

Moreover, there was no evidence presented or suggestion that Petitioner was mentally disabled or otherwise incapable of understanding the rights explained to him. Garner v. Mitchell, 557 F.3d 257, 262-263 (6th Cir. 2009) (upholding the waiver of rights of a nineteen-year-old man

14

with an IQ that placed him in the "borderline range of intelligence" because police had no reason to believe he misunderstood the warnings and "the officers were otherwise reasonable and careful in giving the warnings and obtaining the confession").

The Michigan Court of Appeals applied a totality of the circumstances approach when evaluating Petitioner's claim, and, in so doing, it did not fail to adequately consider relevant factors. Based upon the totality of the circumstances in this case, it was objectively reasonable for the Michigan Court of Appeals to hold that Petitioner's confession was voluntary. See McCalvin v. Yukins, 444 F.3d 713, 720 (6th Cir. 2006). Accordingly, the Court denies the petition.

### B. Certificate of Appealability and Proceeding In Forma Pauperis on Appeal

Before Petitioner may appeal this Court's dispositive decision, a certificate of appealability must issue. See 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. See Slack v. McDaniel, 529 U.S. 473, 484 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327. In applying that standard, a district court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the petitioner's claims. Id. at 336-337. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254; Castro v. United States, 310 F.3d 900, 901 (6th Cir. 2002).

It is not reasonably debatable whether clearly established Supreme Court compelled the Michigan Courts to find that Petitioner's statement to police was involuntary. The Court will, therefore, deny a certificate of appealability.

Although the Court denies a certificate of appealability to Petitioner, the standard for granting an application for leave to proceed in forma pauperis is a lower standard than the standard for certificates of appealability. Foster v. Ludwick, 208 F. Supp. 2d 750, 764 (E.D. Mich. 2002) (citing United States v. Youngblood, 116 F.3d 1113, 1115 (5th Cir. 1997)). Whereas a certificate of appealability may only be granted if a petitioner makes a substantial showing of the denial of a constitutional right, a court may grant in forma pauperis status if it finds that an appeal is being taken in good faith. Id. at 764-765; 28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a). "Good faith" requires a showing that the issues raised are not frivolous; it does not require a showing of probable success on the merits. Foster, 208 F. Supp. 2d at 765. Although jurists of reason would not debate the Court's resolution of Petitioner's claims, the issues are not frivolous; therefore, an appeal could be taken in good faith and Petitioner may proceed in forma pauperis on appeal. Id. at 764-765.

### IV. CONCLUSION

For the reasons stated above, the Court denies the petition (Dkt. 1), denies a certificate of appealability, and grants permission to proceed in forma pauperis on appeal.

SO ORDERED.

Dated: April 13, 2017  s/Mark A. Goldsmith
 Detroit, Michigan  MARK A. GOLDSMITH
  United States District Judge

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 13, 2017.

s/Karri Sandusky
Case Manager
